Filed 11/7/23  In re Isaiah E. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re ISAIAH E., a Person Coming Under the Juvenile Court Law. | B320238 |
| | (Los Angeles County Super. Ct. No. 22CCJP00874) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| F.E., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Mary E. Kelly, Judge.  Reversed.

Benjamin Ekenes, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and William D. Thetford, Deputy County Counsel, for Plaintiff and Respondent.

———————————————

## INTRODUCTION

The Los Angeles County Department of Children and Family Services (Department) filed a dependency petition pursuant to Welfare and Institutions Code section 300, subdivisions (a) (serious physical harm inflicted nonaccidentally) and (b)(1) (failure to protect), in March 2022 on behalf of Isaiah E. (born November 2021) based on two incidents of domestic violence inflicted on Isaiah's mother F.E. by Isaiah's father Marc G.[1] At the jurisdiction hearing two months later, the juvenile court dismissed the subdivision (a) count and sustained the subdivision (b)(1) count. The court declared Isaiah a dependent child of the juvenile court, removed him from Marc, and ordered continued supervision by the Department while Isaiah remained in F.E.'s home.

F.E. appeals the jurisdiction findings and disposition orders, contending there was insufficient evidence to support a finding Isaiah was at substantial risk of serious physical harm by the time of the jurisdiction hearing. We agree and reverse.

———————————

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

# FACTUAL AND PROCEDURAL BACKGROUND

A.     *The February 2022 Domestic Violence Incidents*

On February 7, 2022 the Department received a referral for emotional abuse of Isaiah and Isaiah's half-sibling, Mark V., alleging Marc pulled F.E. by her hair and displayed a gun after F.E. refused to let him into her residence. F.E. had no visible injuries and declined an emergency protective order.

Interviewed by a Department social worker two days later, F.E. explained she lived with Marc's paternal great aunt and other paternal relatives, but Marc did not live there. She stated that on the day of the incident, Marc showed up at the home wanting to see Isaiah. She stepped outside and went to the front of the home with Isaiah. After a while, she brought Isaiah back inside. Marc insisted on continuing to talk to her and began pulling her arm, refusing to go when his relatives told him to leave. Marc told F.E. he wanted to continue their relationship and called her names. His great aunt told Marc to calm down, but he refused and dragged F.E. to the parking lot of the apartment. With his back to his relatives, Marc lifted up his shirt and showed F.E. a gun, pointed the gun at the ground, then fled. F.E. called law enforcement and made a police report.

F.E. explained that she was never in a relationship with Marc, although they had sex twice after meeting at a friend's home. F.E. said there was another incident a month earlier where she was in the passenger seat in Marc's car, and he pushed her after she greeted a male friend. F.E. said because Marc pushed her and lied about his age, she decided she could not be in a relationship with him.

On February 16 the Department received a referral reporting a second domestic violence incident. The referral stated that Marc approached F.E.'s car about a block from her residence, hit the car, cracked the windshield, and demanded she let him inside the car. Out of fear, F.E. opened the door, Marc got in the driver's seat and she moved to the passenger seat. After driving a block, Marc started punching F.E.'s face and head. F.E. exited the car in an attempt to flee, but she fell, and Marc stomped on her back. As a result, she had a visible injury on her left cheek, and she complained of back pain. Interviewed by a Department social worker the same day, F.E. confirmed the incident, which occurred on February 15. After the incident, Marc drove off in F.E.'s car, and F.E. called his great aunt to pick her up. After the great aunt arrived, they found F.E.'s car abandoned a few blocks away. F.E. called the police and was issued an emergency protective order. Isaiah was not present for the incident.

The same day, Marc broke into his relatives' home through a window, took Isaiah's clothing, and also stole a household car. The family called the police, but Marc left before the police arrived. A household member reported Marc had come to the house on February 14 brandishing a firearm and threatening to kill F.E. The record does not reflect that F.E. and Isaiah were present for these particular incidents.

After the second incident, F.E. moved to San Diego with Isaiah and was residing at a confidential location with a cousin. F.E. feared Marc and did not know when she would return from San Diego. F.E. would not disclose the cousin's address because the cousin did not want to be involved.

4

On March 1 the Department informed F.E. that Marc had been arrested and was incarcerated.[2]

B.    *Isaiah's Detention and Release to F.E.*

On March 9 the Department filed a section 300 petition under subdivisions (a) and (b) that alleged domestic violence by Marc and F.E.'s failure to protect.

At the detention hearing on March 14, the juvenile court removed Isaiah from Marc, and ordered monitored visits with him.

The next day, the juvenile court issued a temporary restraining order protecting F.E. from Marc.  On April 6 the juvenile court issued a permanent three-year restraining order protecting F.E. from Marc.

In an interview conducted for the Department's risk assessment report, F.E. conceded the domestic violence allegations were true, but questioned how Isaiah could have been in danger if he was not physically present during the incidents. Regarding count b-1, F.E. disagreed with the allegations of failure to protect because Marc was not violent with her before the two reported domestic violence incidents, and Isaiah was not present when Marc got in her car.

F.E. also explained she was on three years' probation after serving eight months in jail for attempted murder in 2021 (before Isaiah was born), based on an incident where she was driving a

---

[2]    The record does not reflect why Marc was arrested nor how long he was incarcerated.  It is undisputed that at the time of the jurisdiction/disposition hearing, Marc did not have an expected release date.

vehicle with Marc in the car when individuals began shooting at them and he shot back. F.E. was charged because she was the driver.

The Department risk assessment report noted F.E. had left her home and was residing at a confidential location. The Department's report concluded F.E. was protective and that Isaiah could remain with her. The Department reported F.E. "understands the importance of keeping the child Isaiah safe and away from any and all" domestic violence, and had "moved to a confidential location and is accepting of services."

C.    *The Jurisdiction/Disposition Hearing*

On May 2 at the combined jurisdiction and disposition hearing, the juvenile court dismissed count a-1 and sustained the failure to protect allegation in count b-1.[3] The court stated it would sustain the failure to protect allegation for the reasons argued by the Department. These reasons are as follows: the restraining order was granted based on a finding Marc posed a risk; F.E.'s understanding that he posed a risk to her and Isaiah was only recent; F.E. had enrolled in programs only a week earlier; F.E. rejected an emergency protective order after the February 7 incident, even though she recounted a prior physical incident (Marc pushing her while she was in his car) a month earlier; F.E. showed naivety about how domestic violence places children at risk by asking how Isaiah was at risk if he was not present for either incident; and her claim she was unaware of

---

[3]    The Department notes that "Isaiah's attorney asked the juvenile court to dismiss count a-1 and sustain count b-1 after striking mother from the count."

6

Marc's propensity for violence was belied by the fact that he used a firearm in her presence in an attempted murder a year earlier. The juvenile court struck the allegation that Marc brandished a firearm, but stated it was concerned for Isaiah's safety due to the evidence of gun violence.

The juvenile court declared Isaiah a dependent child of the court, and found F.E. was the custodial parent and would retain physical custody of the child. The court found Marc was the noncustodial parent at the time the petition was filed, and that Isaiah would be in substantial danger if placed in his care. The juvenile court ordered family maintenance services for F.E., including a domestic violence program for victims, a parenting class, and individual counseling. The court ordered monitored visits and services for Marc, including a 26-week domestic violence program for perpetrators, a parenting class, and individual counseling.

On May 2 F.E. appealed the juvenile court's jurisdiction findings.[4]

---

[4] The notice of appeal did not identify the juvenile court's disposition order. The Department did not raise this issue in its respondent's brief, and because F.E. appealed from a combined jurisdiction/disposition hearing, we liberally construe the notice of appeal to encompass the disposition order. (See *In re Daniel Z.* (1992) 10 Cal.App.4th 1009, 1017 ["Liberal construction is particularly appropriate here because the jurisdictional finding and dispositional order were rendered simultaneously on January 9, 1992—the date specified in the notice of appeal—and are reflected for each child in a single written order. We shall therefore construe the notice of appeal as properly specifying the dispositional order."]; see also *In re Joshua S.* (2007) 41 Cal.4th 261, 272 [notice of appeal shall be "'liberally construed so as to

Subsequently, on November 10 the juvenile court terminated jurisdiction, but stayed its order pending receipt of a juvenile custody order granting sole legal and physical custody to F.E., with monitored weekly virtual visits for Marc while incarcerated, and three monitored visits a week upon release from custody. On November 17 the court received and issued the juvenile custody order.

The same day, F.E. appealed the findings and orders made on November 10 and 17.[5]

## DISCUSSION

A.    *Governing Law and Standard of Review*

The purpose of section 300 "is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being

---

protect the right of appeal if it is reasonably clear what [the] appellant was trying to appeal from, and where the respondent could not possibly have been misled or prejudiced'"].)

[5]    Although the juvenile court terminated dependency jurisdiction, because F.E. appealed the order terminating jurisdiction and the custody order, her appeal of the jurisdiction findings is not moot. (See *In re Rashad D.* (2021) 63 Cal.App.156, 159 ["[I]n most cases . . . for this court to be able to provide effective relief, the parent must appeal not only from the jurisdiction finding and disposition order but also from the orders terminating jurisdiction and modifying the parent's prior custody status. Without the second appeal, we cannot correct the continuing adverse consequences of the allegedly erroneous jurisdiction finding."].)

8

exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2; see *In re A.F.* (2016) 3 Cal.App.5th 283, 289; *In re Giovanni F.* (2010) 184 Cal.App.4th 594, 599.)

Section 300, subdivision (b)(1), allows a minor to be adjudged a dependent of the juvenile court when "'[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . .' A jurisdiction finding under section 300, subdivision (b)(1), requires the Department to prove three elements:  (1) the parent's or guardian's neglectful conduct or failure or inability to protect the child; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*In re Cole L.* (2021) 70 Cal.App.5th 591, 601; accord, *In re L.W.* (2019) 32 Cal.App.5th 840, 848; *In re Joaquin C.* (2017) 15 Cal.App.5th 537, 561.

Section 300 requires proof the child is subject to a substantial risk of harm at the time of the jurisdiction hearing. (See *In re Cole L., supra,* 70 Cal.App.5th at p. 602; *In re J.N.* (2021) 62 Cal.App.5th 767, 775; *In re D.L.* (2018) 22 Cal.App.5th 1142, 1146.)  The juvenile court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1383; *In re N.M.* (2011) 197 Cal.App.4th 159, 165), and may consider past events in deciding whether a child presently needs the court's protection.  (See *In re J.N.,* at p. 775; *In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1215-1216; *In re N.M.,* at p. 165.)  A parent's "'[p]ast conduct may be probative of current conditions' if there is reason to believe that

9

the conduct will continue." (*In re S.O.* (2002) 103 Cal.App.4th 453, 461; accord, *In re Kadence P.,* at p. 1384; see *In re J.N.,* at p. 775 ["DCFS must establish a nexus between the parent's past conduct and the current risk of harm."].) "To establish a defined risk of harm at the time of the hearing, there 'must be some reason beyond mere speculation to believe the alleged conduct will recur.'" (*In re D.L.,* at p. 1146.)

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court."'" (*In re I.J.* (2013) 56 Cal.4th 766, 773; see *In re I.C.* (2018) 4 Cal.5th 869, 892.) However, "[s]ubstantial evidence is not synonymous with any evidence. [Citation.] To be substantial, the evidence must be of ponderable legal significance and must be reasonable in nature, credible, and of solid value." (*In re M.S.* (2019) 41 Cal.App.5th 568, 580; accord, *In re J.A.* (2020) 47 Cal.App.5th 1036, 1046 [while substantial evidence may consist of inferences, any inferences must rest on the evidence; inferences based on speculation or conjecture are insufficient].)

B.    *Substantial Evidence Does Not Support the Jurisdiction Finding Under Section 300, Subdivision (b)(1)*

The parties do not dispute the two February 2022 incidents were acts of domestic violence perpetrated by Marc on F.E.  F.E. contends, however, that there is no substantial evidence Isaiah was at risk of physical harm at the time of the jurisdiction hearing because he was not present during any domestic violence incident and she took timely protective measures.

"[A]ny domestic dispute that escalates into the use of physical force is a serious matter, appropriately addressed by the juvenile court."  (*In re Cole L.*, *supra,* 70 Cal.App.5th at p. 606.) The focus of section 300, subdivision (b), is physical danger to the child, requiring an evaluation of the existing risk of physical harm to Isaiah from his parents' conflict as of the date of the jurisdiction hearing.  (See *id.* at pp. 606-607.)  Accordingly, in this case the relevant inquiry is whether a significant risk of physical injury to Isaiah existed in May 2022.  "[T]o make that finding requires evidence the earlier threatening conduct will recur."  (*Id.* at p. 607; see *Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856, 869 ["a finding of risk of harm to a child must be based on more than conjecture or a theoretical concern"].)

Reviewing the record in the light most favorable to the juvenile court's determinations, no substantial evidence supports the juvenile court's findings.  As noted above, at the May 2 hearing, the juvenile court essentially adopted the Department's reasoning as its own, apparently over the objections of F.E. and of minor's counsel.  But the record contains no evidence there was a substantial risk of recurrence of domestic violence by Marc against F.E., much less risk of physical harm to Isaiah.  There

11

had been no contact from Marc since the second domestic violence incident, and there was no reasonable likelihood of future contact, let alone physical harm from Marc. First, Marc had been incarcerated since March 1, and remained incarcerated at the time of the jurisdiction hearing. Second, the juvenile court's April 6 permanent, three-year protective order was already in place. Previous orders, including the February 15 emergency protective order, and the March 15 temporary protective order, had prohibited contact from Marc. Third, F.E. and Isaiah had moved from Los Angeles to a confidential location in San Diego immediately after the February 15 incident. Fourth, Isaiah was not present during any domestic violence incident, and had been released to F.E. by the court at the detention hearing, which indicates the court determined he was sufficiently protected to remain in her care. At the time of the jurisdiction hearing, Isaiah had been living safely with F.E. for nearly two months, with no further acts of domestic violence or threats by Marc during that period. Additionally, F.E. was cooperative with the Department, and enrolled in a domestic violence program, individual counseling, and parenting programs.

The Department argues that "neither the restraining order nor father's incarceration eliminated all of the risk" and that "current incarceration does not preclude risk of future harm." But "there 'must be some reason beyond mere speculation to believe the alleged conduct will recur.'" (*In re D.L., supra,* 22 Cal.App.5th at p. 1146.) Even assuming Marc were to be released from incarceration in the near future, and wanted to seek out F.E. in violation of the restraining order (speculative assumptions unsupported by any evidence), the Department fails to explain how Marc would be able to locate F.E., who had moved

12

to a confidential location in a different city in order to protect herself and her child. Under these circumstances, any risk of future harm to Isaiah is entirely speculative. (See *id.* at p. 1147, fn. 2 [insufficient evidence to support finding of future risk based on mother failing to protect child from father's storing an unsecured loaded rifle in the home, where father was incarcerated at the time of the hearing with unknown release date; "[a]ny risk of future danger to D.L. posed by father's keeping a loaded gun in the house would be entirely speculative"].)

The juvenile court's determination that F.E. did not recognize the danger Marc posed to her and Isaiah on a timely basis is also not supported by substantial evidence. The evidence is undisputed that F.E. proactively sought protection and distance from Marc. Because of the incident when Marc pushed her, and because he had lied to her about his age, she had already decided she could not be in a relationship with him. F.E. had blocked him on social media and did not have his contact information. Immediately after the February 7 incident, F.E. contacted law enforcement and made a report. Although she declined an emergency protective order at that time, F.E. immediately made a law enforcement report after the February 15 incident and accepted an emergency protective order. F.E. also left the home of Marc's relatives to stay with a cousin in San Diego at an undisclosed address immediately after the second incident. On March 11 she requested a restraining order; the court issued the temporary restraining order on March 15, and a permanent three-year restraining order on April 6. This all "belies any suggestion she lacked sufficient self-awareness or concern about [Marc]'s conduct to be able to protect

13

her child[].” (*In re Cole L., supra,* 70 Cal.App.5th at p. 607 [mother's “immediate request for a temporary restraining order” after altercation with father who lived elsewhere indicated sufficient ability to protect her children, despite her denial that physical domestic violence had occurred and prior occasion where police had been called].)

On appeal, the Department acknowledges F.E.'s actions “provided a degree of protection” for Isaiah, but argues these protective measures were not “immediately taken” after the first reported domestic violence incident. But only nine days elapsed between the first and second reported incidents of domestic violence. And after the second incident, which was significantly more violent, F.E. took immediate and decisive action. She immediately moved to a confidential location in a different city, accepted an emergency protective order, and requested a restraining order. These actions demonstrate F.E. “recognized [Marc]'s potential danger and proactively sought a restraining order to protect herself and the child[].” (*In re Cole L., supra,* 70 Cal.App.5th at p. 607.) And, “there was no evidence in the record that [the parents] had engaged in multiple acts of domestic violence over an extended time.” (*Id.* at p. 605.) Rather, even considering the incident a month earlier when Marc “pushed” her in the car, that incident and the two reported February incidents all occurred within less than a month and a half of each other, and F.E.'s actions at each stage demonstrated appropriate concern for her own and her child's well-being, with timely and proportional responses to Marc's escalating conduct. That F.E. initially declined an emergency protective order and remained living with Marc's relatives for nine days after the first February incident does not constitute substantial evidence that

14

Isaiah was at substantial risk of suffering serious physical harm at the time of the jurisdiction hearing two months later, or that he was at such risk of harm in the future.

The Department maintains that F.E.'s protective actions "must be considered in light of the severity of the domestic violence and father's propensity for violence." (See *In re I.J., supra,* 56 Cal.4th at p. 778 ["[A]s the abuse becomes more serious, it becomes more necessary to protect the child from even a relatively low probability of that abuse."].) But the two domestic violence incidents and Marc's prior criminal conduct are not substantial evidence that physical violence between F.E. and Marc was likely to recur because Marc was incarcerated at the time of the jurisdiction hearing, and the court had issued a three-year restraining order (which is subject to renewal). Further, as noted above, Isaiah was not present for either domestic violence incident, and the Department does not argue that F.E.'s actions were ineffective or that she would be unlikely to pursue protective actions if Marc were released. The Department does not identify a specific hazard that Isaiah would be exposed to posing a substantial risk of serious physical harm to him. (See *In re J.N., supra,* 62 Cal.App.5th at p. 776 ["[A]lthough we acknowledge that, on an abstract level, violent crime is incompatible with child safety, DCFS cannot use such generalities to satisfy its burden of proving an '*identified, specific hazard* in the child's environment' that poses a substantial risk of serious physical harm to him."].)[6]

---

[6] The Department also speculates there were no further incidents of violence, not because of the restraining order, but because Marc was incarcerated. To the extent the Department

15

In sum, there was no substantial evidence that F.E. or Isaiah were at substantial risk of harm from Marc at the time of the jurisdiction hearing.

## DISPOSITION

The juvenile court's jurisdiction findings and disposition orders are reversed.  The juvenile court is directed to dismiss the dependency petition and vacate all subsequent orders after it assumed jurisdiction.

MARTINEZ, J.

We concur:

PERLUSS, P. J.

FEUER, J.

---

takes the position the restraining order was somehow ineffective in this case (or for that matter the emergency protective order and the temporary protective order), it is unclear why F.E.'s immediate failure to avail herself of these remedies would be substantial evidence supporting the court's jurisdiction findings and disposition orders.